**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SAMUEL AMFOSAKYI** | : | **Civil Action No. 1:11-CV-651** |
| | : | |
| **Plaintiff** | : | |
| | : | **(Chief Judge Kane)** |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **FRITO LAY** | : | |
| | : | |
| **Defendant** | : | |

**REPORT AND RECOMMENDATION**

## I.    Introduction

"If you tell the truth you don't have to remember anything." Mark Twain.

This case is a telling reminder of the ease, simplicity and cardinal virtue of candor.  The plaintiff, Samuel Amfosakyi, comes before the Court, having filed this employment discrimination case after he was fired by the defendant, Frito Lay, following an episode where Amofsakyi now admits that he repeatedly lied to his employer regarding his whereabouts at a time when he left work without permission. Amfosakyi's complaint invites the Court to find that his discharge is not a product of his deceit, but rather is a function of discrimination by Frito Lay.  The question of whether Amfosakyi has made a legally sufficient claim of workplace discrimination

in the face of his undisputed workplace absenteeism and lies is now before us on the defendant's motion for summary judgment.  (Doc. 30 )

Amfosakyi, however, has now also allegedly engaged in deceit in the presentation of this discrimination claim, providing the Court and the defendant with a falsely back-dated letter in the course of discovery.  This litigation deceit is now also before us on a motion for sanctions filed by the defendant. (Doc. 27)

Considering the truth of these matters, we find both that Amfosakyi has engaged in deceptive, misleading litigation misconduct, and that his termination was a product of his earlier deceitful conduct towards his employer.  Therefore, we recommend that the defendant's motion for sanctions and motion for summary judgment be granted.

## II.    <u>Statement of Facts and of the Case</u>

The factual background of this case, both in terms of Amfosakyi's past employment by Frito Lay and the current allegations of litigation misconduct by Amfosakyi, is a history marked by repeated episodes exhibiting a disappointing lack of candor.  That history is set forth below:

### A.    <u>Amfosakyi's Employment and Termination</u>

Samuel Amfosakyi is a United States citizen who was born in the African nation of Ghana. (Doc. 32, ¶¶4-6)  Amfosakyi describes himself ethnically as  Black,

or African American. (Id., ¶5.)  The defendant, Frito Lay, is a food producer which operates a manufacturing facility in York, PA. (Id., ¶ 7.)

On December 27, 2004, Amfosakyi  applied for employment at Frito Lay's York manufacturing facility. (Id., ¶ 8.)  Amfosakyi was hired by Frito Lay on February 7, 2005, (id., ¶10), and remained employed by Frito Lay for approximately four and one-half years, until this employment was terminated on July 8, 2009. (Id., ¶46.)

During the four-and-one-half years when Amfosakyi was employed at Frito Lay, that company followed a strict code of conduct that was enforced throughout the corporation. (Id., ¶11.)  As part of this code of conduct Frito Lay required truthfulness and candor from all of its employees. (Id., ¶12.)  Falsification and other forms of employee dishonesty were regarded by Frito Lay as code of conduct violations and could result in termination of employment under the code of conduct. (Id., ¶13.)

As part of his new employee orientation, Amfosakyi was trained on this code of conduct , and Amfosakyi received periodic code of conduct training throughout his tenure at Frito Lay. (Id., ¶15.)  Therefore, Amofsakyi was aware that falsification of documents or any other type of dishonesty violated company rules. (Id., ¶ 15.)

During his tenure at Frito Lay's York facility, Amfosakyi held a number of positions. (Id., ¶¶ 16 and 17.)  In these various positions, Amfosakyi was cited on a

number of occasions for absenteeism and unacceptable lapses in attendance. (<u>Id</u>., ¶18.) Indeed, at one time these attendance issues had been sufficiently severe that Amfosakyi had progressed to Step III of Frito Lay's disciplinary process,  the final step in employee progressive discipline at Frito Lay. (<u>Id</u>.)

In July of 2009 Amfosakyi held a third shift position at the Frito Lay plant, a position that required him to work a twelve hour shift from 7:00 p.m. to 7:00 a.m. (<u>Id</u>., ¶¶ 19-20.)  On July 4, 2009, Amfosakyi arrived at work at approximately 7:00 p.m. (<u>Id</u>., ¶ 21.)  Upon his arrival, Amfosakyi did not report to his supervisors any personal issue that might require him to leave work prior to the completion of his shift. (<u>Id</u>., ¶ 22.)

In celebration of the 4th of July holiday, various Frito Lay employees had pooled funds to buy fried chicken which was placed in the lunch room to be eaten by shift workers that evening. (<u>Id</u>., ¶23.)  At 9:00 p.m., Amfosakyi left his work area, went to the lunch room, collected a bag of fried chicken, exited the Frito lay plant, went to his car, and drove away. (<u>Id</u>., ¶¶24-25.)  Amfosakyi did not seek or receive permission to leave work on July 4, 2009, and did not inform his supervisors that he was leaving the plant. (<u>Id</u>., ¶26.)  While Amfosakyi left work without permission or excuse, he had remained on the clock at work, and failed to clock out when leaving the facility at 9:00 p.m. on July 4. (<u>Id</u>., ¶ 27.)  Amfosakyi was absent from the plant,

but remained on the clock, for approximately 4 ½ hours, until he returned to the facility sometime around 1:30 a.m. on July 5.(Id., ¶29.)  When he returned to work in the early morning hours of July 5, 2009, Amfosakyi was confronted by John Yarrish, a supervisor, who asked where he had been. (Id., ¶ 31.)

Amfosakyi lied to this supervisor, falsely stating that he had been in the facility all evening, except for 30 or so minutes when he left the plant to get something to eat. (Id., ¶ 32.)  Amfosakyi now admits that this statement was not true. (Id., ¶ 33.)  Later that shift, Amfosakyi repeated this lie, when he was presented with a written statement which he was asked to sign stating that he left the Frito Lay facility at approximately 9:00 p.m. and had returned at approximately 1:00 a.m. (Id., ¶ 34.) Amfosakyi refused to sign this statement which accurately described his absenteeism on July 4-5, 2009. Instead, Amofsakyi prepared and signed a revised statement, which falsely asserted that he had only been away from work from 10:30 p.m. to 11:05 p.m. (Id., ¶¶ 35-38.) Confronted with this absenteeism, and these falsehoods, Frito Lay supervisors sent Amfosakyi home and told him not to report for work the following day. (Id., ¶¶39-40.) At no time during this work-related discussion did Supervisor Yarrish refer to Amfosakyi's race or national origin. (Id., ¶ 54.)

On July 7, 2009, Amfosakyi was contacted by Frito Lay and directed to come to the York facility for a meeting. (Id., ¶ 41.)  Amofsakyi then met on July 7,2009,

with Tien Vieux and John Lassack, two Business Unit Leaders ("BULs") at the York plant. (Id., ¶ 42.)  Questioned by Vieux and Lassack, Amfosakyi once again lied, initially stating that he had been at the York plant throughout his July 4-5 shift, except for some 30 minutes when he claimed that he had gone to eat. (Id., ¶ 43.) According to Amfosakyi, he had been briefly delayed when he was caught in July 4th holiday parade traffic while out of the facility, but had returned five minutes later than the 30 minutes allowed for lunch.(Id., ¶ 44.)  Amfosakyi now admits that this statement was not true and concedes that he was not truthful at first when explaining his whereabouts on July 4 to Vieux and Lassack, but claims that he later admitted to leaving the plant from 9:00 p.m. to about 1:30 a.m. (Id., ¶ 45.)

Presented with this apparent absenteeism and falsification, Frito Lay conducted an inquiry into this workplace misconduct.  As part of this inquiry, Michele L. Bass, a Frito Lay Manufacturing Manager,  determined  that Amfosalyi had, in fact, left the York facility on July 4 for over four hours without permission while he remained on the clock, and then lied about this misconduct. (Id., ¶ 48.)  On the basis of these findings, and given Amfosakyi's history of delinquencies,  Bass decided to terminate Amfosakyi, a decision which was communicated to Amfosakyi by letter on July 8, 2009. (Id., ¶¶ 46-48.)

### B.    Amfosakyi's Claims of Discrimination

Amfosakyi commenced this lawsuit by filing a complaint of discrimination against Frito Lay on April 8, 2011. (Doc. 1)  In his complaint, Amfosakyi, a black male and a United States citizen of Ghanaian heritage, alleges that the defendant discriminated against him on the basis of his race and national origin when Frito Lay discharged him in 2009, acts which Amfosakyi alleges were taken in violation of Title VII of the Civil rights Act of 1964, 42 U.S.C. §2000e-5, and the Pennsylvania Human Relations Act, 43 Pa.C.S. §951. (Id.)

Amfosakyi has now admitted in the course of this litigation to leaving the York Frito Lay facility without permission on July 4, 2009, while still on the clock, repeatedly lying about his whereabouts when questioned by management, and falsifying a written statement, conduct which constituted code of conduct violations. In the face of these admissions, Amfosakyi's claim of workplace discrimination now rests upon the thinnest of reeds, a circumstantial claim of discrimination based upon what Amfosakyi describes as disparate treatment of another Frito Lay employee three years earlier.  Specifically, Amfosakyi contends that three years prior to his firing, in 2006, a Caucasian employee, George Rye, falsely reported that Amfosakyi had caused a pallet jack to strike Rye's foot, and that Rye was not discharged for this false statement. (Doc. 32, ¶ 62)  This temporally and topically remote claim is the lynchpin

7

of Amfosakyi's workplace discrimination case,( <u>Id</u>., ¶ 63), and is repeatedly referred to by Amfosakyi in these proceedings. (<u>Id</u>.)

However, with respect to this remote incident, it is undisputed that Frito Lay conducted a workplace  inquiry in 2006, which was wholly inconclusive. (<u>Id</u>., ¶ 64.) Therefore,  neither Amfosakyi nor George Rye was disciplined for the 2006 incident, and that incident played no role in the decision three years later to terminate Amfosakyi following his unexplained absenteeism and false statements in July of 2009. (<u>Id</u>., ¶ 65.)  Indeed, the supervisor who fired Amfosakyi, Michele L. Bass, was not involved in this 2006 incident, and played no role in the resolution of this prior workplace episode. (<u>Id</u>., ¶ 66.)

While Bass, as a Frito Lay manager, played no role in this 2006 incident involving George Rye, it is undisputed that Bass has previously terminated other employees for making false statements in violation of Frito Lay's Code of Conduct. Specifically, on December 10, 2008, Bass discharged a female Caucasian employee at the York facility for being untruthful when questioned by management, actions which were determined to be a code of conduct violation. (<u>Id</u>., ¶¶ 69-70.)  Thus, Frito Lay has presented undisputed evidence which shows that this particular policy has been applied to Frito Lay employees by Bass without regard to race, gender, or national origin. (<u>Id</u>.)

The second thin reed which Amfosakyi presents in support on his claim of discrimination is a factual assertion designed to mitigate the gravity of Amfosakyi's undisputed workplace absenteeism and acknowledged lies on July 4-5, 2009. Amofsakyi now asserts that he left work in July of 2009 because of a medical emergency relating to his son, and claims that he had previously notified Frito Lay in writing of his son's special needs. This factual assertion by Amfosakyi sets the stage for consideration of some profoundly troubling issues of litigation misconduct, and allegations of renewed deceit by Amfosakyi in the course of this lawsuit.

## C.     <u>Amfosakyi's Alleged Litigation Misconduct</u>

With respect to this claim of misconduct by Amfosakyi arising out of this litigation, the pertinent facts can be simply stated. As part of his discrimination claim, Amfosakyi alleges that on July 4, 2009, he left work without an excuse because of a medical emergency relating to his son. Amfosakyi has also claimed that he had previously notified Frito Lay in writing of his son's special needs. (Docs. 27, 28, 35, 38) To support this claim, Amfosakyi initially produced in discovery a typewritten letter dated April 30, 2009, and addressed to a Frito Lay employee, Danielle Fritts, which purported to describe his son's medical condition and needs. (<u>Id</u>.) At a deposition conducted on August 4, 2011, Amfosakyi was questioned regarding this

typewritten letter, and specifically testified that the letter was prepared and submitted to Ms. Fritts on April 30, 2009, the date depicted on the typewritten letter.(Id.)

This assertion is not true.(Id.)   Indeed, the falsity of this assertion was independently revealed in several ways during the course of discovery.  First, Frito Lay had no record of ever receiving this correspondence from Amfosakyi, a circumstance which cast doubt over the veracity of the letter. (Id.)  Second, the history and provenance of this April 30, 2009, typed letter were entirely suspect because the addressee on the letter, Danielle Fritts, had not taken and did not use the last name Fritts on April 30, 2009.(Id.)  Rather, she adopted that last name some months later, after the date upon which this letter was allegedly created. (Id.)

Confronted with these troubling inconsistencies, Frito Lay sought, and obtained leave of court to conduct a forensic examination of Amfosakyi's computer, which was used to type the April 30, 2009 letter. (Id.)  That forensic examination disclosed that this letter was, in fact, first created in August of 2010, fifteen months after the date set forth on the letter. (Id.)

Amfosakyi's responses to these revelations have been confused, contradictory and have underscored the wisdom of Mark Twain's advice: "If you tell the truth you don't have to remember anything."   First, Amfosakyi endeavored to explain the misnomer as to the addressee's name on this letter by claiming that he knew Danielle

Fritts well, and therefore knew months prior to her marriage that she intended to take the married name of Fritts. (Id.)  Accordingly, Amfosakyi asserted, implausibly, that he unilaterally began using her married name months before her wedding. (Id.) Danielle Fritts has responded to Amfosakyi's statements by categorically denying that she ever revealed her marital plans to Amfosakyi, and it appears that Amfosakyi and Fritts worked entirely different shifts at Frito Lay, making social banter of the type claimed by Amfosakyi highly unlikely.(Id.)

Amfosakyi then addressed the immutable fact that a forensic examination of his computer revealed that this letter was written in August of 2010, rather than April of 2009, in a similarly implausible fashion. (Id.)  According to Amfosakyi, he sent a handwritten letter to Frito Lay on April 30, 2009, and then created the typewritten version which he later represented as the original letter in August of 2010 to preserve this evidence. (Id.)  Amfosakyi's claim that his conduct involved the preservation of evidence rather than the creation of evidence, strains credulity on a number of grounds.  First, it ignores the fact that Frito Lay has no record of receiving this April 30, 2009, letter in any format, typewritten or handwritten.  Second, the credibility of this claim is undermined by the fact that Amfosakyi's alleged handwritten letter, like its typewritten progeny, is addressed to Danielle Fritts, and uses a name that Ms. Fritts did not herself adopt until June, 2009.  Third, Amfosakyi's current explanation does

not explain why he initially testified at his deposition that he created the typewritten letter on April 30, 2009.

Finally, Amfosakyi's assertion that he typed the letter to preserve it cannot withstand even superficial scrutiny, as revealed by Amfosakyi's exchange with this Court at a hearing held on this sanctions matter on December 5, 2011. (Doc. 40)  At this hearing, Amfosakyi refused to testify, declining to explain his conduct under oath, but  repeated his claim that he typed the letter in August 2010 simply to preserve this evidence.  In response to questions from the Court asking what Amfosakyi used as a model to type the letter, the plaintiff responded that he typed the letter from a copy of the handwritten letter he claimed to have delivered to Frito Lay in April of 2009.  Thus, Amfosakyi's current explanation, if credited, would require the Court to accept that he typed a copy of a letter he already possessed in order to preserve that same letter, a gesture which would have been completely unnecessary since Amfosakyi claims that he already had a copy of the handwritten letter in his possession.

### D.   The Defendant's Motions for Sanctions and Summary Judgment

It is against this background that the defendant has filed a motion for sanctions and a motion for summary judgment. (Docs. 27 and 30)  These two motions seek dismissal of Amfosakyi's complaint, both on its merits, and as a sanction for this alleged litigation misconduct.  With respect to the sanctions motion, this Court conducted a hearing on December 5, 2011, at which the defendant made any extensive offer fo proof relating to its litigation misconduct claim.  We also provided Amfosakyi with an opportunity to testify, under oath, regarding these serious allegations and rebut these claims.  Amfosakyi declined this invitation to testify and justify his actions, while repeating his current claim that he was simply preserving a copy of this letter.

These motions have now both been fully briefed by the parties, (Docs. 28, 31, 32, 33, 35, 44, and 45 ), and are therefore ripe for resolution.  For the reasons set forth below, it is recommended that both defense motions be granted.

### III.   Discussion

### A.   Sanctions and Spoliation–Standards of Review

Decisions regarding dismissal of actions as sanctions for misconduct in civil litigation rest in the sound discretion of the Court, and will not be disturbed absent an abuse of that discretion. Emerson v. Thiel College, 296 F.3d 184, 190 (3d Cir. 2002)(citations omitted).  That discretion, however, while broad, is governed by

13

certain factors, commonly referred to as <u>Poulis</u> factors.  As the United States Court of Appeals for the Third Circuit has noted:

> To determine whether the District Court abused its discretion [in imposing sanctions which affect the substantive outcome of litigation], we evaluate its balancing of the following factors: (1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and (6) the meritoriousness of the claim or defense. <u>Poulis v. State Farm Fire and Cas. Co.</u>, 747 F.2d 863, 868 (3d Cir.1984).

<u>Emerson</u>, 296 F.3d at 190.

In exercising this discretion "there is no 'magic formula' that we apply to determine whether a District Court has abused its discretion in dismissing for failure to prosecute." <u>Lopez v. Cousins</u>, No. 10-1877,  2011 WL 2489897, *3 (3d Cir. June 23, 2011)(quoting <u>Briscoe v. Klem</u>, 538 F.3d 252 (3d Cir. 2008))  Therefore, "[i]n balancing the <u>Poulis</u> factors, [courts] do not [employ] a . . . 'mechanical calculation' to determine whether a District Court abused its discretion in dismissing a plaintiff's case. <u>Mindek v. Rigatti</u>, 964 F.2d 1369, 1373 (3d Cir.1992)." <u>Briscoe v. Klaus</u>, 538 F.3d at 263.  Consistent with this view, it is well-settled that " 'no single <u>Poulis</u> factor is dispositive,' <u>Ware</u>, 322 F.3d at 222, [and it is] clear that 'not all of the <u>Poulis</u> factors need be satisfied in order to dismiss a complaint.' <u>Mindek</u>, 964 F.2d at 1373." <u>Briscoe v. Klaus</u>,  538 F.3d at 263.

Rather, in assessing these factors, we proceed from the premise that "dismissal with prejudice is a drastic sanction that is 'only appropriate in limited circumstances and doubts should be resolved in favor of reaching a decision on the merits.' Briscoe, 538 F.3d at 257 (citation omitted)." Lopez v. Cousins, 2011 WL 2489897 at *2. Accordingly, we begin by examining the degree of personal responsibility of a party in failing to comply with court orders, to determine whether those failures are inadvertent or willful.  In this setting, it has been held that willfulness involves "strategic," "intentional or self-serving behavior," and not mere negligence. Adams v. Trs. of N.J. Brewery Emps.' Pension Trust Fund, 29 F.3d 863, 875 (3d Cir.1994). In this regard, "[g]enerally, '[w]illfulness involves intentional or self-serving behavior.' . . .  If the conduct is merely negligent or inadvertent, we will not call the conduct 'contumacious.' " Briscoe v. Klaus, 538 F.3d 252, 262 (3d Cir. 2008).

We also look to whether the failures by a party are isolated, or whether they represent a persistent history of dilatory behavior.  In this regard:

> "Extensive or repeated delay or delinquency constitutes a history of dilatoriness, such as consistent non-response to interrogatories, or consistent tardiness in complying with court orders." Adams, 29 F.3d at 874; see also Ware, 322 F.3d at 224 (finding that a history of dilatory conduct existed because the plaintiffs "failed repeatedly" to provide a damages calculation for the defendant); Emerson, 296 F.3d at 191 (finding that a history of dilatory conduct existed because the "procedural history of this case reflects continuous dilatoriness" as demonstrated by the plaintiff's multiple requests for stays and failure to comply with multiple deadlines). . . . . However, conduct that occurs one

15

or two times is insufficient to demonstrate a "history of dilatoriness." <u>See</u> <u>Scarborough v. Eubanks</u>, 747 F.2d 871, 875 (3d Cir.1984) (finding that, although the plaintiff's pretrial documents were "filed inexcusably late," it was not the same history of dilatoriness present in <u>Poulis,</u>747 F.2d at 868); <u>Donnelly v. Johns-Manville Sales Corp.</u>, 677 F.2d 339, 343 (3d Cir.1982) (reinstating plaintiff's case where the plaintiff acted dilatory on one occasion but no evidence existed that the plaintiff's behavior was willful). Furthermore, we must evaluate "a party's problematic acts ... in light of its behavior over the life of the case." <u>Adams</u>, 29 F.3d at 875 (citing <u>Dyotherm Corp. v. Turbo Machine Co.</u>, 392 F.2d 146 (3d Cir.1968)).

<u>Briscoe v. Klaus,</u> 538 F.3d at 260-61.

Beyond this assessment of the nature and quality of the conduct of the party against whom sanctions are sought, we must also look to the harm or prejudice suffered by the party seeking dismissal as a sanction. Indeed, this factor–the prejudice suffered by the party seeking sanctions–is entitled to great weight and careful consideration. As the United States Court of Appeals for the Third Circuit has observed:

"Evidence of prejudice to an adversary would bear substantial weight in support of a dismissal or default judgment." <u>Adams v. Trustees of N.J.</u> <u>Brewery Employees' Pension Trust Fund</u>, 29 F.3d 863, 873-74 (3d Cir.1994) (internal quotation marks and citation omitted). Generally, prejudice includes "the irretrievable loss of evidence, the inevitable dimming of witnesses' memories, or the excessive and possibly irremediable burdens or costs imposed on the opposing party." <u>Id</u>. at 874 (internal quotation marks and citations omitted). . . . However, prejudice is not limited to "irremediable" or "irreparable" harm. <u>Id.</u>; <u>see also</u> <u>Ware</u> <u>v. Rodale Press, Inc.</u>, 322 F.3d 218, 222 (3d Cir.2003); <u>Curtis T. Bedwell</u> <u>& Sons, Inc. v. Int'l Fidelity Ins. Co.</u>, 843 F.2d 683, 693-94 (3d Cir.1988). It also includes "the burden imposed by impeding a party's

ability to prepare effectively a full and complete trial strategy." <u>Ware</u>, 322 F.3d at 222. Oftentimes, this type of prejudice involves disputes between the parties on discovery matters because the defendants were deprived of necessary information or had to expend costs to obtain court orders for compliance. <u>See, e.g., Poulis</u>, 747 F.2d at 868 (finding that the defendants were prejudiced where the plaintiffs did not answer interrogatories,the defendants had to file a motion to compel the plaintiffs' answers, and the defendant had "to file its pre-trial statement without the opportunity to review plaintiffs' pretrial statement which was due to be filed first"); <u>Ware,</u> 322 F.3d at 220-23 (affirming the District Court's conclusion that a defendant had been prejudiced where the plaintiff repeatedly ignored the defendant's discovery request for the plaintiff's computation of damages and did not provide it until one week prior to trial).

<u>Briscoe  v. Klaus</u>, 538 F.3d at 259-60.

One particular form of litigation misconduct which may give rise to the sanction of dismissal is the spoliation of evidence by a party. "Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation. <u>Mosaid Techs., Inc. v. Samsung Elecs. Co., Ltd.,</u> 348 F.Supp.2d 332, 335 (D.N.J.2004)." <u>Fortune v. Bitner.</u> No. 01-111, 2006 WL 839346, *1 (M.D.Pa. March 29, 2006); <u>see</u> <u>Ogin v. Ahmed</u>, 563 F.Supp.2d. 539, 542 (M.D. Pa. 2008).  In assessing a spoliation claim:

[R]elevant authority requires that four (4) factors be satisfied for the rule permitting an adverse inference instruction to apply: 1) the evidence in question must be within the party's control; 2) it must appear that there has been actual suppression or withholding of the evidence; 3) the evidence destroyed or withheld was relevant to claims or defenses; and

> 4) it was reasonably foreseeable that the evidence would later be discoverable. <u>Mosaid</u>, 348 F.Supp.2d at 336  citing <u>Brewer</u>, 72 F.3d at 334; <u>Scott v. IBM Corp.</u>, 196 F.R.D. 233, 248-50 (D.N.J.2000); <u>Veloso v. Western Bedding Supply Co.</u>, 281 F.Supp.2d 743, 746 (D.N.J.2003). Additionally, the United States District Court for the District of New Jersey recognized: "While a litigant is under no duty to keep or retain every document in its possession, even in advance of litigation, it is under a duty to preserve what it knows, or reasonably should know, will likely be requested in reasonably foreseeable litigation." <u>Mosaid</u>, 348 F.Supp.2d at 336  (quoting <u>Scott</u>, 196 F.R.D. at 249).

<u>Ogin</u>,563 F.Supp.2d at 543.

Thus, "[a] party which reasonably anticipates litigation has an affirmative duty to preserve relevant evidence. <u>Baliotis v. McNeil</u>, 870 F.Supp. 1285, 1290 (M.D.Pa.1994).  Where evidence is destroyed, sanctions may be appropriate, including the outright dismissal of claims, the exclusion of countervailing evidence, or a jury instruction on the 'spoliation inference.'  This inference permits the jury to assume that 'the destroyed evidence would have been unfavorable to the position of the offending party.' <u>Schmid v. Milwaukee Elec. Tool Corp.</u>, 13 F.3d 76, 78 (3d Cir.1994)." <u>Howell v. Maytag</u>, 168 F.R.D. 502, 505 (M.D.Pa. 1996)

If the court finds that there is a culpable destruction or spoliation of evidence, the question then becomes determining the appropriate sanction for this act of spoliation.  In this respect:

The United States Court of Appeals for the Third Circuit has applied three (3) key considerations to determine whether a sanction for spoliation of evidence is appropriate. <u>Schmid</u>, 13 F.3d at 79. The considerations are: 1) the degree of fault of the party who altered or destroyed the evidence; 2) the degree of prejudice suffered by the opposing party; and 3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future. <u>Id</u>. When appropriate, a court may impose any potential sanction including: 1) dismissal of a claim or granting judgment in favor of a prejudiced party; 2) suppression of evidence; 3) an adverse inference, referred to as the spoliation inference; 4) fines; and 5) attorneys' fees and costs. <u>Mosaid</u>, 348 F.Supp.2d at 335.

<u>Ogin</u>, 563 F.Supp.2d at 545.

With these basic principles in mind we then turn to consideration of the defendant's motion for sanctions, and motion for summary judgment.

**B.**     **Assessment of the Poulis Factors In This Case**

**1.**     **The Poulis Factors Weigh Heavily in Favor of Dismissal of This Action**

At the outset, in this case we find that an assessment of these <u>Poulis</u> factors weighs heavily in favor of dismissal of this action.  This case presents a singular, and singularly troubling, circumstance:  the apparent presentation of a falsely back-dated letter in discovery, coupled with a series of mendacious and misleading statements regarding the authenticity, nature and origins of that correspondence.   In such instances, where a party engages in conduct which is antithetical to the purpose for which courts exist, to seek the truth, the sanction of dismissal is entirely appropriate. Indeed, a dispassionate assessment of the <u>Poulis</u> factors indicates that the factors uniformly favor a significant sanction here.

At the outset, a consideration of the first <u>Poulis</u> factor, the extent of the party's personal responsibility, weighs heavily against the plaintiff.  With respect to this factor, we find that this misconduct is wholly and exclusively the personal responsibility of Samuel Amfosakyi.  It is Amfosakyi who created this back-dated typed letter; Amfosakyi who then first swore that the letter was typed in April of 2009; and Amfosakyi who later provided a series of contradictory and implausible explanations for the creation and provenance of this typed letter.  This misleading

conduct extended over months, and entailed substantial efforts by the court and opposing counsel before the truth behind the manufacturing of this exhibit began to come to light.  In such instances, where a party directly engages in grave misconduct in the course of pre-trial discovery, dismissal of the individual plaintiff's claims clearly rests in the sound discretion of the court. Tillio v. Mendelsohn, 256 F. App'x 509 (3d Cir. 2007) (failure to timely serve pleadings compels dismissal); Reshard v. Lankenau Hospital, 256 F. App'x 506  (3d Cir. 2007) (failure to comply with discovery compels dismissal); Azubuko v. Bell National Organization, 243 F. App'x 728 (3d Cir. 2007) (failure to file amended complaint prejudices defense and compels dismissal).

Similarly, the second Poulis factor– the prejudice to the adversary caused by the failure to abide by court orders–also favors dismissal of  this action.  In this regard, as we have previously noted, "[e]vidence of prejudice to an adversary . . .bear[s] substantial weight in support of a dismissal." Adams v. Trustees of N.J. Brewery Employees' Pension Trust Fund, 29 F.3d 863, 873-74 (3d Cir.1994) (internal quotation marks and citation omitted).  Such prejudice can be identified and defined in many ways.  In some instances this prejudice flows from "the irretrievable loss of evidence, the inevitable dimming of witnesses' memories, or the excessive and possibly irremediable burdens or costs imposed on the opposing party." Id. at 874. However,

it is clear that the type of prejudice which may warrant dismissal of claims under Poulis is not simply limited to prejudice that causes an "irremediable" or "irreparable" harm in the defense of the case. Id.   Quite the contrary, it has been observed that, in this context, prejudice justifying dismissal of claims as a sanction may also include such things as: "'the burden imposed by impeding a party's ability to prepare effectively a full and complete trial strategy.' Ware, 322 F.3d at 222. Oftentimes, this type of prejudice involves disputes between the parties on discovery matters because the defendants were deprived of necessary information or had to expend costs to obtain court orders for compliance. See, e.g., Poulis, 747 F.2d at 868." Briscoe  v. Klaus, 538 F.3d at 259-60.

Viewed in this light, there is an undeniable prejudice to the defendant which flows from Amfosakyi's initial decision to create and falsely characterize a back-dated letter which he provided to Frito Lay in discovery.   Frito Lay has been put to substantial cost, effort, and delay over the span of many months to prove what Amfosakyi always knew–this April 30, 2009 typewritten letter was not what it appeared to be or what Amfosakyi initially claimed that it was.   Amfosakyi's misconduct, his lies, evasions, concealments and half-truths, clearly prejudiced the defense's "ability to prepare effectively a full and complete trial strategy." Ware, 322 F.3d at 222.   Furthermore, as a result of this misconduct the defendants were

"deprived of necessary information and had to expend costs to obtain court orders to determine the truth. See, e.g., Poulis, 747 F.2d at 868." Briscoe v. Klaus, 538 F.3d at 259-60.  Thus, the defense suffered a direct, and substantial, prejudice as a result of Amfosakyi's misdeeds.

When one considers the third Poulis factor-the history of dilatoriness on the plaintiffs' part–it becomes clear that dismissal of this action is appropriate here.  In this regard, while it is evident that "'[e]xtensive or repeated delay or delinquency constitutes a history of dilatoriness, such as consistent non-response to interrogatories, or consistent tardiness in complying with court orders.' Adams, 29 F.3d at 874; [it is also clear that] conduct that occurs one or two times is insufficient to demonstrate a 'history of dilatoriness.'" Briscoe v. Klaus, 538 F.3d at 260-61 (some citations omitted).

In this case, Amfosakyi's misconduct has spanned many months and involved multiple acts of deceit.  This misconduct began with the creation of this back-dated letter.  It entailed an initial, and false, claim that the typed letter was written and sent in April of 2009.   It then has involved a tapestry of increasingly implausible statements and explanations by Amfosakyi regarding the genesis of this letter.  This persistent misconduct is extensive, well-documented, and amply displays a history of delinquency which warrants sanctions.

23

The fourth <u>Poulis</u> factor–whether the conduct of the party was willful or in bad faith–also cuts against Amfosakyi.   In this setting we must assess whether Amfosakyi's conduct reflects mere inadvertence or willful conduct, in that it involved "strategic," "intentional or self-serving behavior," and not mere negligence.  <u>Adams v. Trs. of N.J. Brewery Emps.' Pension Trust Fund</u>, 29 F.3d 863, 875 (3d Cir.1994). Here, we find that the plaintiff's actions were willful, and reflect a pattern of willfulness, in which Amfosakyi strained at a series of implausible claims to buttress his initial, and false, claim that the typewritten April 30, 2009 letter he provided in discovery was prepared in April of 2009.

While <u>Poulis</u> also enjoins us to consider a fifth factor, the effectiveness of sanctions other than dismissal, cases construing <u>Poulis</u> agree that in a situation where we are confronted by *pro se* litigant who engages in serious litigation misconduct, lesser sanctions may not be an effective alternative. <u>See, e.g., Briscoe v. Klaus</u>, 538 F.3d 252, 262-63 (3d Cir. 2008); <u>Emerson</u>, 296 F.3d at 191.  Rather, in such instances, the sanction of dismissal may be the only effective remedy available to the court.

Finally, under <u>Poulis</u> we are cautioned to consider one other factor, the meritoriousness of the plaintiffs' claims.  In our view, however, consideration of this factor cannot save Amfosakyi's claims since it is evident that those claims completely

fail on their merits, and the defendant is entitled to summary judgment on the merits of Amfosakyi's claims.  This merits analysis is set forth below.[1]

## C.    The Defendant is Also Entitled to Summary Judgment

As we have noted, Frito Lay has also moved for summary judgment on the merits in this case.  Through summary adjudication a court is empowered to dispose of those claims that do not present a "genuine issue as to any material fact," Fed. R. Civ. P. 56, and for which a trial would be "an empty and unnecessary formality." Univac Dental Co. v. Dentsply Int'l, Inc., No. 07-0493, 2010 U.S. Dist. LEXIS 31615, at *4 (M.D. Pa. Mar. 31, 2010).  A district court may properly grant a motion for summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S.

---

[1]In any event, it is well-settled that " 'no single Poulis factor is dispositive,' Ware, 322 F.3d at 222, [and it is] clear that 'not all of the Poulis factors need be satisfied in order to dismiss a complaint.' Mindek, 964 F.2d at 1373." Briscoe v. Klaus,  538 F.3d at 263. Therefore, Amfosakyi cannot avoid severe sanctions simply through some strained arguments regarding the merits of his underlying claims.

242, 248 (1986).  A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party.  Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322.  Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence.  Anderson, 477 U.S. at 249.  There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts.  Id. at 252; see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In making this determination, the court must "consider all evidence in the

light most favorable to the party opposing the motion." <u>A.W. v. Jersey City Pub.</u> <u>Schs.</u>, 486 F.3d 791, 794 (3d Cir. 2007).

Here, Samuel Amfosakyi  has alleged that the termination of his employment was motivated by unlawful discrimination against him on the basis of race or national origin, in violation of Title VII of the Civil rights Act of 1964, 42 U.S.C.  §2000e-5, and the Pennsylvania Human Relations Act, 43 Pa.C.S. §951.  Thus, these claims must be analyzed under the familiar <u>McDonnell Douglas</u>[2] burden shifting framework that is applied to discrimination claims where there is no direct evidence of discrimination. Under 42 U.S.C. § 2000e-2(a)(1), it is unlawful for any employer "to fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ."  In <u>McDonnell Douglas</u>, the Supreme Court defined the analytical standards by which such claims are measured, stating that in this setting a plaintiff has the initial burden of establishing a *prima facie* case of discrimination by showing: (1) that he is a member of a protected class; (2) he is qualified for the employment position in question; (3) he suffered an adverse employment action; and (4) such action occurred under circumstances that give rise to an inference of unlawful discrimination. <u>Jones</u>

---

[2]  <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

v. School Dist., 198 F.3d 403, 411 (3d Cir. 1999); see also McDonnell Douglas Corp.

v. Green, 411 U.S. 792, 802 (1973).

Once an employee establishes a *prima facie* case, the employer must articulate a permissible reason for taking the adverse employment action.  See, e.g., Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997).  At this stage, the employer's burden is "relatively light; it is satisfied if the [employer] articulates any legitimate reason for the [adverse employment action]; the [employer] need not prove that the articulated reason actually motivated the [action]."  Id. (quoting Woodson v. Scott Paper, 109 F.3d 913, 920 n.2 (3d Cir. 1997).  If the employer carries its burden of articulating a legitimate basis for taking the adverse action, the burden returns to the employee to establish by a preponderance of the evidence that the employer's purportedly legitimate reason is, in fact, pretextual.  Id.

In order to show that an employer's proffered non-discriminatory reason is pretextual, a plaintiff "must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).  Notably, this is a "difficult burden on the plaintiff."  Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005) (internal

quotation marks omitted).  The Third Circuit has explained that in order to satisfy this burden of proving pretext, a plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact finder could rationally find them unworthy of credence."  Jones, 198 F.3d at 413.  In considering the parties' competing arguments and evidentiary support, we must remain mindful that "[t]he question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]."  Keller v. Orix Credit Alliance, 130 F.3d 1101, 1109 (3d Cir. 1997).

When assessing the legal sufficiency of an employment discrimination claim one factual matter that courts are cautioned to consider is the issue of the temporal proximity between the actions which form the basis for the plaintiff's claims.  In a civil rights context, it is clearly recognized that such temporal proximity can, in appropriate cases, "be probative of causation." Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003)(citing Rauser v. Horn, 241 F.33d 330, 334 (3d Cir. 2001))  However, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close,' O'Neal v. Ferguson Constr. Co., 237 F.3d

1248, 1253 (C.A.10 2001). <u>See, e.g.</u>, <u>Richmond v. ONEOK, Inc.</u>, 120 F.3d 205, 209

(C.A.10 1997) (3-month period insufficient); <u>Hughes v. Derwinski</u>, 967 F.2d 1168,

1174-1175 (C.A.7 1992)( 4-month period insufficient)." <u>Clark County School Dist.</u>

<u>v. Breeden</u>, 532 U.S. 268, 273-74 (2001).

Defining when in a civil rights case questions of temporal proximity present

factual issues permitting an inference of discrimination that defeat a summary

judgment motion is necessarily a matter of degree.  In this regard, it has been aptly

observed that:

> As the Third Circuit has stated:[I]t is causation, not temporal proximity
> itself, that is an element of plaintiff prima facie case, and temporal
> proximity merely provides an evidentiary basis from which an inference
> can be drawn. The element of causation, which necessarily involves an
> inquiry into the motives of an employer, is highly context-specific. When
> there may be valid reasons why the adverse employment action was not
> taken immediately, the absence of immediacy between the cause and
> effect does not disprove causation. <u>Kachmar v. Sungard Data Sys., Inc.</u>,
> 109 F.3d 173, 178 (3d Cir.1997). For temporal proximity alone to
> establish causation, the time difference must be so short as to be
> "unusually suggestive of retaliatory motive." <u>Marasco</u>, 318 F.3d at 512.
> While the Third Circuit has not explicitly defined the closeness in time
> required to be "unusually suggestive" of retaliatory motive, the court has
> held that a temporal proximity of two days was sufficient to establish
> causation on its own, <u>see Farrell v. Planters Lifesavers Co.</u>, 206 F.3d
> 271, 279 n. 5 (3d Cir.2000), while a temporal proximity of tens days was
> sufficient to establish causation only when accompanied by other
> evidence of wrongdoing on the part of the employer, <u>Shellenberger v.</u>
> <u>Summit Bancorp., Inc.</u>, 318 F.3d 183, 189 (3d Cir.2003). This suggests
> that the difference in time must be measured in days, rather than in
> weeks or months, to suggest causation on its own. Where such closeness

in time is lacking, "circumstantial evidence of a 'pattern of antagonism' following the protected conduct" or any other suggestions of causation that can be gleaned from the record "as a whole" can also give rise to an inference of causation. <u>Farrell,</u> 206 F.3d at 280 (quoting <u>Kachmar,</u> 109 F.3d at 177); <u>see also Thomas v. Town of Hammonton</u>, 351 F.3d 108, 114 (3d Cir.2003) (suggesting that "timing plus other evidence" may be an appropriate test for causation).

<u>Ober v. Miller</u>, No. 04-1669, 2007 WL 4443256, *11 (M.D.Pa. Dec. 18, 2007).

With the foregoing legal guidelines in mind, we turn to the case before the Court.

Judged against the <u>McDonnell Douglas</u> standard, Amfosakyi's discrimination claim fails at every level of the analysis compelled in these cases.  First, accepting that Amfosakyi is a member of a protected class, was qualified for the employment position in question, and suffered an adverse employment action, we still conclude that Amfosakyi has not shown that such action occurred under circumstances that give rise to an inference of unlawful discrimination. <u>Jones v. School Dist.</u>, 198 F.3d 403, 411 (3d Cir. 1999).  While such discrimination can be shown through disparate treatment of similarly situated workers, to be considered similarly situated the "employees must be similarly situated in all relevant respects," taking into account factors such as the "employees' job responsibilities, the supervisors and decision makers, and the nature of the misconduct engaged in." <u>See</u> <u>Wilcher v. Postmaster Gen. App. A. No.</u> 10-3075, 2011 WL 3468322, at *2 (3d Cir. Aug. 9, 2011) (<u>citing Russell</u>

v. University of Toledo, 537 F.3d. 596 (6th Cir. 2008); Lee v. Kansas City S. Ry. Co.,

574 F.3d 253,259-61 (5th Cir. 2009).   As this court has observed, "In order for

employees to be deemed similarly situated, ... the individuals with whom the plaintiff

seeks to compare [his] treatment must have dealt with the same supervisor, have been

subject to the same standards and have engaged in the same conduct without

differentiating or mitigating circumstances that would distinguish their conduct or the

employer's treatment of them for it." Ogden v. Keystone Residence, 226 F.Supp.2d

588, 603 (M.D. Pa. 2002).

Here, Amfosakyi completely fails to make a *prima facie* case of discrimination.

By 2009, Amfosakyi was a troubled employee, with a history of chronic absenteeism.

In July of 2009, Amfosakyi left work without notice or excuse.   Amfosakyi

compounded this misconduct by remaining on the clock even though he was absent

without excuse from work.   Amfosakyi then lied repeatedly about the fact, nature and

duration of his absenteeism.   While Amfosakyi engaged in this workplace misconduct

which he compounded through false statements, Frito Lay managers never engaged

in any actions towards him in July of 2009 which created the slightest suggestion of

some racial animus.   Thus, Amofsakyi is left to try to cobble together a Title VII claim

out of disparate treatment which he claims was afforded to another employee, George

Rye, three years earlier in 2006.   This effort is unavailing, however.   Indeed,

Amfosakyi's claims in this regard fail since it is apparent that these employees are not "similarly situated in all relevant respects," taking into account factors such as the "employees' job responsibilities, the supervisors and decision makers, and the nature of the misconduct engaged in." <u>See</u> <u>Wilcher v. Postmaster Gen. App. A. No. </u>10-3075,2011 WL 3468322, at *2 (3d Cir. Aug. 9, 2011).

Rather these two workplace incidents are strikingly dissimilar. They involve widely disparate events separated by three years. The nature and the quality of the incidents differs dramatically. The 2006 incident involves a dispute between Amfosakyi and Rye concerning an alleged workplace accident, a dispute mired in confusion and uncertainty that resulted in no disciplinary action against any employee. In contrast, the July 2009 events which led to Amfosakyi's termination were a clear instance of absenteeism by a chronic offender which was aggravated by deceit. Furthermore, the corporate disciplinary decision-makers were entirely different in these two episodes, and Frito Lay has shown that Ms. Bass the decision-maker for Amfosakyi in 2009 had earlier meted out similar disciplinary to another employee without regard for race, gender or national origin. Thus, this single remote and dissimilar episode, standing alone, does not carry Amfosakyi's burden of establishing a *prima facie* case.

But even if we found that Amfosakyi had carried his initial burden of proof, we conclude that Frito Lay has amply articulated a permissible reason for taking the adverse employment action.  See, e.g., Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997).  Frito Lay has longstanding corporate integrity policies that require honesty of employees.  Frito Lay also, understandably, expects its workers to appear, and remain on the job when they are scheduled to work.  Frito Lay has plainly shown that Amofsakyi–an employee who suffered from chronic absenteeism–left work without excuse and then lied to his supervisors.  This constellation of workplace misconduct–which is essentially undisputed–provides a complete, and completely non-discriminatory, justification for the defendant's actions.

Given Frito Lay's showing that its termination decision rested on wholly justifiable and non-discriminatory considerations, Amfosakyi now "must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).  This is a "difficult burden on the plaintiff," Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005) (internal quotation marks omitted), and one which we find Amfosakyi has not met by merely pointing to different types of work place

discipline, relating to disparate conduct, occurring three years earlier, and involving different corporate decision-makers.

In sum, since Amfosakyi's discrimination claims fail as a matter of law at each level of this analysis, the defendant is entitled to summary judgment on the merits of these claims.

## IV.    **Recommendation**

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that the defendant's motion for summary judgment and motion for sanctions should be GRANTED and Amfosakyi's complaint should be dismissed.[3]

The Parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo

---

[3]We recognize that the defendant's motion for sanctions also seeks an award of costs against the plaintiff. This report and recommendation addresses only the question of whether this action should be dismissed, and recommends dismissal of this case. It is therefore further recommended that the issue of costs be deferred pending the district court's resolution of the merits of this case.

determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 22nd day of December 2011.

*S/Martin C.  Carlson*
Martin C. Carlson
United States Magistrate Judge